[Civ. No. 14458.   First Dist., Div. One.   Jan. 23, 1951.]

C. A. SOHN, Appellant, v. JOSEPH J. KITTEL et al.,
Respondents.

[Civ. No. 14457.   First Dist., Div. One.   Jan. 23, 1951.]

JOSEPH J. KITTEL, Respondent, v. A. A. TIESLAU et al.,
Appellants.

H. J. Kleefisch for Appellants.

Simeon E. Sheffey for Respondents.

PETERS, P. J.—By action 1 Civ. 14458 C. A. Sohn sought
to quiet her title to a certain residence located in Oakland
against the claims of Joseph J. Kittel and his wife, while in ac-

tion 1 Civ. 14457 Kittel sought, through the medium of an unlawful detainer action, to recover possession of the same piece of property from A. A. Tieslau and Clara Tieslau, his wife, together with damages for the wrongful detention. The two actions were consolidated for trial and have been briefed and considered together on appeal. Sohn and the Tieslaus appeal from the judgments in favor of the Kittels, and from the additional findings made after entry of the judgments.

The basic problem involved is whether Kittel, who is the record owner of the property by reason of having purchased it at a trustee's sale, is the owner of the property, or whether he in fact purchased it pursuant to an agreement with the Tieslaus to purchase it on their behalf. Sohn is a grantee of the Tieslaus, having received a deed from them after the foreclosure. If they lost their title by reason of the foreclosure, Sohn's claims are without merit.

The property involved was purchased with the community funds of the Tieslaus in 1942, title being taken in the name of Clara Tieslau. She claims it as her separate property, and the trial court found it was her separate property. Thereafter, and until the time of trial, the Tieslaus resided on the property. In August of 1946, Mrs. Tieslau borrowed $17,500 from the Bank of America, which debt was secured by a first deed of trust on the property. The money secured from this loan was used by Tieslau in his business.

Tieslau was engaged in business in a partnership entitled A. A. Tieslau & Son. He had known Joseph Kittel for 10 or 12 years, and had had several business transactions with him. Admittedly Kittel, on several occasions, loaned Tieslau or the partnership various sums of money, unsecured. In 1946, the partnership became heavily involved, and in March of 1947 it became involved in an involuntary bankruptcy proceeding.

According to the testimony of Kittel, the partnership owed him about $9,000 in September of 1946. At that time Tieslau was badly in need of funds to pay certain outstanding checks, labor claims, and insurance premiums. Kittel, according to his testimony, which was believed by the trial court, refused to advance any more money without security, and suggested a mortgage on the house. Under these circumstances, in the fall of 1946, Kittel advanced an additional $2,500 to Tieslau, and other sums, and the Tieslaus gave him a $12,000 second mortgage on the property, which was recorded.

In the meantime the Tieslaus had defaulted in their payments to the Bank of America on the first deed of trust.

Notice of default was served, and on June 12, 1948, the property was sold at a trustee's sale. Kittel was the only bidder, and, through his agent Walden, bid $30,000 for the property. The property was sold to Kittel for that sum. At that time the debt to the Bank of America approximated $20,000. On the day of sale, Kittel paid $3,000 on the purchase price, and a short time later borrowed $17,500 from the Western Mortgage Company on the security of the house, and paid that on the purchase price. The balance of the purchase price of $30,000 he "paid" by cancelling his second mortgage. A trustee's deed, dated June 14, 1948, naming Kittel and his wife as grantees (which deed was delivered to Kittel in August, 1948), was executed and delivered to the Kittels. This is the source of their title.

On September 7, 1948, Mrs. Tieslau executed a quitclaim of the property to C. A. Sohn and delivered the deed to her pursuant to an oral agreement that Sohn would finance the litigation to recover the property from the Kittels, and, if successful, the property would be sold, Sohn would be refunded her costs and expenses, and the balance divided equally between Sohn and Mrs. Tieslau. That is the source of Sohn's claim of title.

After the foreclosure sale in June of 1948, the Tieslaus remained in possession and occupancy of the property. Admittedly, the payments due from Kittel to the Western Mortgage Company started in October of 1948, and amounted to $140 per month. Admittedly, starting in October of 1948, and for four months thereafter, the Tieslaus paid to Kittel the sum of $140 per month, and, in December of 1948, the Tieslaus made the tax payment then due on the property. This litigation was commenced by Sohn filing her quiet title action on February 7, 1949.

The Kittels, of course, established a prima facie case by proving that they purchased the property at the trustee's sale. It was the theory of the Tieslaus that Kittel purchased at that sale as their agent and on their behalf. They offered evidence that undoubtedly would have supported findings in accordance with this theory, if such evidence had been believed by the trial court. But, on conflicting evidence, the trial court found against this agency theory. It found that Kittel did not purchase the property as agent for the Tieslaus but purchased for and on his own behalf, and that there was no agreement, oral or otherwise, that the purchase was to be made on behalf of the Tieslaus. The only major question

presented on these appeals is as to the sufficiency of the evidence to support these findings.

The Tieslaus' theory of the facts is that the $12,000 second mortgage given to Kittel was "a phony mortgage," given in anticipation of the possibility of the bankruptcy of the partnership, to "protect" Mrs. Tieslau's interests in the property against the claims of Mr. Tieslau's creditors; that the only money that Kittel has in the property, so far as Mrs. Tieslau is concerned, is the $3,000 down payment made at the trustee's sale; that the "phony" second mortgage was secured by Kittel pursuant to a scheme whereby he could thus salvage the debts owed him by the partnership from Mrs. Tieslau's separate property; that after the bank recorded a notice of default on the deed of trust the Tieslaus attempted to secure a loan to pay off the bank, and, in this connection, enlisted the services of Kittel. Tieslau testified that the loan of $17,500 to Kittel by the Western Mortgage Company was arranged by him and his agent, and that Kittel simply picked up the letter of commitment from the Western Mortgage Company to finance the purchase. The Tieslaus also testified that after the trustee's sale they paid the $140 a month due on the Western Mortgage Company loan to Kittel, who paid it to the loan company, and also paid the December, 1948, installment of taxes at Kittel's request. This, they claim, supports their contention that Kittel bought the property in at the trustee's sale pursuant to an oral agreement to protect Mrs. Tieslau's interests, and on behalf of the Tieslaus. While, no doubt, this evidence of the monthly payments supports the inference that the mortgage of Western Mortgage Company was, as between Kittel and the Tieslaus, the debt of the Tieslaus, such inference is by no means inevitable. ■ Kittel testified that the payments were for rent or on other indebtedness due to him. He testified that immediately after the trustee's sale he told the Tieslaus that the property was his, but that if it could be sold for more than he had in it, the surplus he would give to the Tieslaus as a gift. Kittel unequivocally denied all of the major portions of the other testimony of the Tieslaus. He testified that he would never have advanced the last $2,500 to the partnership without security, and that the security offered was a second mortgage on the house; that he purchased the property at the trustee's sale on his own account to protect his second mortgage, which he claimed was valid. He directly denied that he acted as the agent of the Tieslaus in making the purchase. This testimony is corroborated in vital

particulars by Max Walden, a real estate broker, who made the bid at the trustee's sale on behalf of Kittel. Walden testified, as did Kittel, that immediately after the sale he and Kittel visited the purchased property and met the Tieslaus. During the ensuing conversation Mrs. Tieslau referred to the house as "my house." Walden testified that Kittel thereupon unequivocally told Mrs. Tieslau that the house no longer belonged to her but belonged to him, and that Mrs. Tieslau replied "I realize that and I appreciate all you have done for us," whereupon Kittel then made his offer to give the Tieslaus all over $30,000 that might be realized from a sale of the property. Kittel testified to the same effect. Mr. and Mrs. Tieslau testified that at this conversation Kittel said he had "saved" the property for them by buying it at the trustee's sale. Kittel denied making this statement. The trial court obviously believed Kittel and his witnesses and disbelieved the Tieslaus.

Walden also testified that it was he who negotiated the loan from the Western Mortgage Company for Kittel; that an agent of Tieslau had tried to negotiate such a loan, but the company had refused to lend money to Tieslau; that he, Walden, was paid a commission by the Western Mortgage Company of $175 for negotiating the loan to Kittel.

The Tieslaus place much reliance on a letter sent them by Kittel, dated November 2, 1948, which was several months after the trustee's sale, in which Kittel itemized the sums due to him from the Tieslaus, showing a net balance, including the Western Mortgage Company loan, of $28,282.93. In this letter Kittel credited the Tieslaus with the various monthly payments of $140 made by them to Kittel. The Tieslaus claim that this letter demonstrates that after the trustee's sale Kittel was holding title to the property for the Tieslaus subject to the indebtedness owed him. While the letter is consistent with this interpretation, it is by no means inconsistent with the testimony of Kittel that he purchased the property to protect his second mortgage, and that if he ever got out of it what he had in it, he would turn over any excess, as a gift, to the Tieslaus.

Thus, on all essential points, there was a direct conflict of testimony. The trial court, who saw, heard, and observed the witnesses, elected to believe Kittel and his witnesses and to disbelieve the Tieslaus and some of their witnesses. The case is peculiarly a factual one. The findings of the trial court, based as they are on substantial evidence, are binding

on this court and cannot be disturbed. In support of the trial court it should be mentioned that Mr. Tieslau's explanation of what he termed the ''phony'' mortgage was fantastic, while Mrs. Tieslau was impeached by a demonstration that she had testified at the bankruptcy proceedings directly contrary to what she testified to on this trial as to her relationship with Mrs. Sohn. These were undoubtedly factors that induced the trial court to disbelieve these witnesses.

The Tieslaus, in the *Kittel* v. *Tieslau* action, contend that the complaint in that action was defective because it does not allege that they were given notice of the foreclosure sale as is required by section 2924 of the Civil Code and section 692, subdivision 3, of the Code of Civil Procedure. The evidence shows that Tieslau attended the foreclosure sale and that both Tieslaus knew of the foreclosure proceedings. In addition, the deed of trust executed by the Tieslaus expressly provided that any trustee's deed issued pursuant thereto should be conclusive proof of the recitals which it contained. The trustee's deed contains full recitals of the various steps taken in the foreclosure proceedings, including service. These recitals are conclusive. (*Pacific States S. & L. Co.* v. *O'Neill*, 7 Cal.2d 596, 599 [61 P.2d 1160].)

The judgments and orders appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 22, 1951.